UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Jacksonville Division

---

Response to Dispositive Motion
CIVIL ACTION NO. 3:09-cv-403-J-34 JRK

---

JOY PERRY, doing business as FREEDOM THROUGH
CHRIST PRISON MINISTRY and PRISON PEN PALS, and
WRITEAPRISONER.COM, INC., a Florida corporation,

Plaintiffs,

vs.

BARRY REDDISH, in his official capacity as Warden
at Union Correctional Institution, STEVEN SINGER,
in his official capacity as Warden at Florida State Prison,
KIM SOUTHERLAND, in her official capacity as
Warden at the Lowell Correctional Institution, and
WALTER A. McNEIL, in his official capacity as
Secretary of the Florida Department of Corrections,

Defendants.

---

## PLAINTIFFS' RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Randall C. Berg, Jr., Esq.
Florida Bar No. 318371
Joshua A. Glickman, Esq.
Florida Bar No. 43994
Shawn A. Heller, Esq.
Florida Bar No. 46346

Florida Justice Institute, Inc.
3750 Miami Tower
100 S.E. Second Street
Miami, Florida 33131-2309
305-358-2081     305-358-0910 (FAX)
E-mail: *RBerg@FloridaJusticeInstitute.org*
E-mail: *JGlickman@FloridaJusticeInstitute.org*
E-mail: *SHeller@FloridaJusticeInstitute.org*

## PLAINTIFFS' RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Joy Perry, doing business as "Freedom Through Christ Prison Ministry" and "Prison Pen Pals," and WriteAPrisoner.com, Inc., by and through undersigned counsel, pursuant to Rule 56, Fed. R. Civ. P., respond to Defendants' Motion for Summary Judgment (D.E. 79) (hereinafter "Mot."),[1] and state:

### I.      Material Facts in Dispute Preclude Summary Judgment

In their Statement of Material and Genuine Facts, Defendants establish the existence of vigorously disputed material facts which preclude summary judgment in their favor.[2]  Mot. at 2-6.  At the outset, Defendants assert that "allowing inmates to solicit pen pals would have a significant deleterious effect on the FDOC's resources."  Mot. at 6.  Despite Defendants' reliance on this allegation as a genuine fact not in dispute, the extent to which the accommodation of Plaintiffs' First Amendment rights would have on the allocation of prison resources is indisputably a legal determination, and is certainly in dispute.  *See* Bair Decl. ¶¶ 24-26, D.E. 80-5.  Defendants similarly allege as fact that "[t]he running of pen pal scams affects internal prison security as well."  Mot. at 6.  However, Plaintiffs have ample evidence that internal prison security was not an impetus for Rule 33-210.101(9), F.A.C. (the "Rule"), and Defendants have failed to demonstrate any negative impact on institutional security caused by pen pal solicitation.  *See* Bair Decl. ¶ 26.

---

[1] Plaintiffs have filed a Motion to Strike prior to the filing of this Response, and request that if the Court is inclined to grant Plaintiffs' Motion to Strike, the Court disregard the inappropriate opinion testimony of James Upchurch and Alex Taylor when reviewing Defendants' Motion and this Response.  In an abundance of caution, however, Plaintiffs address Upchurch and Taylor's inappropriate testimony when responding to Defendants' Motion.

[2] If the moving party relies on conflicting evidence or disputed facts, summary judgment will not be granted.  *Augusta Iron & Steel Works v. Employers Insurance of Wasau*, 835 F.2d 855, 856 (11th Cir. 1988).

In support of their argument that the Rule is necessary to protect the public from fraud, Defendants again attempt to pass off material disputes as uncontested facts. Defendants assert that "[p]rior to the enactment of the rule, prison pen pal scams were wide spread," and continue to repeat, nearly verbatim, the disputed affidavit testimony of Steve Arnold, a former FDOC inspector who has never reviewed the Rule. Mot. at 5-6. Again, the issue of whether pen pal scams were widespread prior to the Rule is a material fact which Plaintiffs have repeatedly disputed, pointing out that Defendants have failed to identify even one identifiable prison pen pal scam which has been perpetuated or any instances where the solicitation of a pen pal has resulted in any member of the public being defrauded in any way. *See* Bair Decl. ¶¶ 12-13, 27.

## II.     Plaintiffs Have Standing

### A.     Plaintiffs are advancing their own First Amendment rights

In order to have standing to bring a claim, a person must have suffered an injury in fact; there must be a causal connection between that person's injury and the conduct complained of; and it must be likely, as opposed to merely speculative, that that person's injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

Defendants have asserted that Plaintiffs do not enjoy standing to bring the First Amendment claims alleged herein. *See* Mot. at 6-7; 9-13. Despite this assertion, however, Defendants fail to make <u>any</u> argument that Plaintiffs have not met *Lujan*'s standing requirements. Instead of properly analyzing Plaintiffs' standing, Defendants argue only that Plaintiffs fail to "advance their own First Amendment rights of expression," and lack standing to do so on behalf of third-parties not before this Court. In so arguing, however, Defendants display a fundamental misunderstanding of both the contours of the First Amendment rights at issue, as well as the nature of Plaintiffs' First Amendment injuries.

The Supreme Court has held that "there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). Because "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners," the Court has held that the First Amendment equally protects the rights of both non-prisoner correspondents and inmates against interference with a non-prisoner's communication. *See Procunier v. Martinez*, 416 U.S. 396, 409 (1974). Contrary to Defendants' assertions, this First Amendment analysis does not hinge on the relationship between the two parties to the communication or the extent of any personal relationship established, as courts have repeatedly held that there is "no principled basis for distinguishing publications specifically ordered by a prison inmate from [private] letters written to that inmate for purposes of first amendment protection." *Prison Legal News v. Lehman*, 397 F.3d 692, 701 (9th Cir. 2005).

Here, Plaintiffs have clearly suffered a violation of their own First Amendment rights as a result of the Rule. Despite Defendants' repeated attempts to portray Plaintiffs as nothing more than "conduits" for free world citizens to communicate with prisoners via pen pal relationships, Plaintiffs have alleged, and Defendants themselves have admitted, that, prior to implementation of the Rule, Plaintiffs were able to send inmates letters regarding their services, and were similarly able to receive letters from inmates seeking to utilize those services. Lovell Decl. ¶ 13, D.E. 80-2; Perry Decl. ¶ 14, D.E. 80-1. Since the Rule's adoption, however, any and all correspondence from Plaintiffs, regardless of content, has been banned from entering the FDOC, and has been returned to Plaintiffs. Lovell Decl. ¶¶ 14-15; Perry Decl. ¶¶ 15-16.

Regardless of whether an inmate then chooses to establish a pen pal relationship through Plaintiffs, it is Defendants' interference – indeed, complete ban – of these initial communications which forms the undeniable basis of Plaintiffs' First Amendment claims.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976)("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also Procunier*, 416 U.S. at 408 ("Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech.").[3]

Despite Defendants' ban of <u>all</u> correspondence sent by Plaintiffs, Defendants next argue that Plaintiff WriteAPrisoner.com ("WAP") has suffered no "constitutionally significant" injury based solely on the holdings of *Prison Legal News v. McDonough*, 200 Fed. App'x 873 (11th Cir. 2006) and *The Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000).  As more fully discussed below, however, neither of these cited cases have any applicability to the analysis of Plaintiffs' claims.

In *Prison Legal News v. McDonough*, the Eleventh Circuit analyzed a regulation of the FDOC which prohibited inmates from receiving compensation for writing articles for publication.  200 Fed. Appx. at 875.  The court held that Prison Legal News ("PLN") had failed to demonstrate a sufficient constitutional injury <u>for the sole reason</u> that the publication had failed to present evidence that the challenged rule had any impact on its ability to publish the magazine, finding that there was "simply no evidence that the Rule has had any impact at all on PLN's ability to publish its magazine and distribute [it] to inmates."  *See id.* at 876-7.

Similarly, in *The Pitt News v. Fisher*, a student-run newspaper alleged that a state statute that punished businesses for running advertisements for alcoholic beverages in school newspa-

---

[3] *See also Owen v. Wille*, 117 F.3d 1235, 1237 (11th Cir. 1997) ("'[T]he blanket prohibition against the receipt of [a] publication by any prisoner carries a heavy presumption of unconstitutionality.'") (citations omitted).

pers violated its First Amendment rights. 215 F.3d at 357. The Third Circuit held that the newspaper's claimed loss of advertising revenue did not rise to the level of a constitutional violation, because, as in *Prison Legal News*, The Pitt News was still able to publish its newspaper despite the challenged regulation, and as such the statute posed only "a threat to the newspaper's ability to receive compensation for publishing this information, not the newspaper's ability to *publish* the information." *Id.* at 367, n. 13 (emphasis in original).

Unlike *Prison Legal News* and *The Pitt News*, here WAP has not claimed First Amendment injury due to economic loss. Rather, WAP's First Amendment injury is that it has been <u>completely</u> prevented from corresponding with <u>any</u> Florida inmates as a result of the Rule. Indeed, in both cases cited by Defendants, the court found the fact that the publisher was still able to continue corresponding with its intended audience despite the restrictions to be dispositive of the First Amendment issue. Here, however, the record is replete with evidence that WAP has enjoyed no such continued ability to correspond with Florida inmates since the implementation of the Rule, and instead has been completely banned from all FDOC facilities.

**B.    Perry satisfies RLUIPA's constitutional standing requirements**

Defendants' contention that RLUIPA does not apply to Joy Perry ("Perry") is entirely without merit. Mot. at 7-9. RLUIPA does not state that the only person who can bring a claim is an institutionalized person. To the contrary, RLUIPA is completely absent of any such limiting language. Indeed, while Defendants repeatedly emphasize the "plain language" of the statute, their Motion is absent of any real discussion of the language set forth in the statute, which makes it clear that Congress intended for RLUIPA litigants to be broadly granted standing.

Congress's intent for RLUIPA to have the broadest possible scope of standing could not be clearer: "[S]tanding to assert a claim or defense under this section shall be governed by the

general rules of standing under Article III of the Constitution."  42 U.S.C. § 2000cc-2(a).  Congress further stated that RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Chapter and the Constitution." *Id.* at 3(g).  Thus, the broad standing provisions of RLUIPA indicate that Congress intended to confer standing to litigants who satisfy the requirements of Article III, without requiring more. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 103 (1979) (explaining that, where Congress intends standing to extend to the full limits of Article III, the normal prudential rules don't apply).[4]  Since standing under RLUIPA is governed only by the requirements of Article III, Perry enjoys standing to bring a claim if the three standing requirements set forth above in *Lujan* are met.  Page 2, *supra*.[5]

> i.     *Perry Has Suffered an Injury in Fact*

Injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent', not 'conjectural' or 'hypothetical.'"  *Id.*  Under this definition, Perry has clearly suffered an injury in fact.  Her actual, concrete and legally protected interest in practicing her religion by ministering to inmates and connecting inmates to churches for religious guidance has been substantially burdened by the Rule.  *See McDaniel v. Paty*, 435 U.S. 618, 626 (1978).

Indeed, the protection of such religious exercise in an institutionalized setting is the exact goal of RLUIPA.  Senator Orrin Hatch, *Statements of Introduced Bills and Joint Resolutions*, S. Doc. No. 6688, 106th Cong. (July 13, 2000).  In bringing this challenge, Perry seeks to protect not on-

---

[4] There is certainly no suggestion, either in the plain language of the Act or its legislative history, that Congress intended to limit claimants to only institutionalized persons as Defendants suggest.  *See* Derek L. Gaubatz, *RLUIPA at Four: Evaluating the Success and Constitutionality of RLUIPA's Prisoner Provisions*, 28 Harv.J.L. & Pub. Pol'y 501, 511-12 n. 44 (2005)("RLUIPA was seen as a way to remove state imposed barriers <u>from those seeking to minster to prisoners</u>.")(emphasis added).

[5] It is worth noting that Defendants have completely failed to address any of the Article III standing requirements.

ly her religious freedoms, but also to challenge a government regulation limiting the free exercise of religion in an institutional setting.

Defendants' reliance on *McCollum v. State of California*, No. C 04-03339 CRB, 2006 WL 2263912 (N.D. Cal. Aug. 08, 2006), is misplaced.  Most notably, *McCollum* is on appeal to the Ninth Circuit, where this exact standing issue has been raised.  Case No. 09-16404.  In *McCollum*, a Wiccan clergy member brought suit under RLUIPA alleging that his religion was being discriminated against because the California DOC refused to hire clergy members who did not belong to one of five religions. *Id.* at *1.  The court dismissed McCollum's claim for lack of standing without any real analysis of standing or the legislative purpose of RLUIPA.  *Id.*  Moreover, unlike Perry, the injury McCollum claimed to have suffered was his inability to get a paid chaplain's position with the California DOC.  *Id.*  Perry's claim, however, focuses on her inability to exercise her religious freedoms by ministering to institutionalized persons; such religious exercise is expressly provided for in the Act.  42 U.S.C. § 2000cc-1.[6]

The Supreme Court has also liberalized standing requirements in other situations where, like here, a statute is silent as to who may bring a claim but where Congress expanded standing in the legislation itself.  *See Gladstone Realtors*, 441 U.S. at 100 (finding standing for rental "testers" who brought discrimination claims in housing cases even though the testers were not actually going to rent or purchase the housing)("Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one 'who otherwise would be barred by prudential standing rules.'").

---

[6] Similarly, in *Olsen v. Mukasey*, 541 F.3d 827 (8th Cir. 2008), also relied upon by Defendants, the plaintiff clearly failed to allege that the religious exercise of an institutionalized person had been substantially burdened, as required by RLUIPA.  *Olsen*, 541 F.3d at 830.  Perry, however, has clearly alleged violations of both her religious exercise rights, as well as the religious exercise rights of the inmates that she ministers to.

       *ii.*       *Perry's Injury is Traceable to Defendants' Rule*

The second requirement for Article III standing requires that the injury be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Lujan*, 504 U.S. at 560. Here, there is no question that the Rule stands as an absolute barrier to Perry's ability to minster to institutionalized persons via pen pal solicitations and to match prisoners with persons of faith and churches for religious and spiritual guidance. Prior to adoption of the Rule, Perry had provided religious counsel and fellowship to inmates in the FDOC without incident. Perry Decl. ¶ 14. Since the Rule's adoption, however, Perry has been unable to correspond with FDOC inmates, and has been prevented from operating the religious ministry which she had directed for over thirty years and which is so central to her religious practice. Perry Decl. ¶¶ 15-16, 19.

       *iii.*      *Perry's Injury is Likely to be Redressed by a Favorable Ruling*

A plaintiff meets *Lujan*'s redressability test if it is likely that the injury will be redressed by a favorable decision; the redressability of injury need not be certain. *Lujan*, 504 U.S. at 560. Here, the Rule is the sole impediment to both Perry's right to practice her religion by writing to inmates and connecting inmates to willing churches for religious guidance, as well as the rights of those inmates to receive Perry's religious teachings. Accordingly, Perry's injury will certainly be redressed by the invalidation of the Rule.

    **C.**    **Plaintiffs also enjoy third-party standing to assert claims on behalf of incarcerated persons**

Plaintiffs further enjoy third-party standing to raise their claims on behalf of inmates. The Court has allowed third-party standing in cases, like here, where the enforcement of the challenged conduct affects third-parties indirectly. *See Kowalski v. Tesmer*, 543 U.S. 125, 129

(2004).  Courts have permitted third-party standing in such cases where: (1) the litigant has suf-
fered an injury in fact, giving her a sufficiently concrete interest in the outcome of the dispute;
(2) the litigant has a close relationship to the third-party; and (3) there exists some hindrance to
the third-party's ability to protect her own interests.  *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

In *Young Apts., Inc. v. Town of Jupiter*, the Eleventh Circuit allowed third-party standing af-
ter analyzing these requirements.  529 F.3d 1027, 1041-2 (11th Cir. 2008).  The court noted that,
as an exception to the general limitation against third-party standing, businesses have third-party
standing to assert claims on behalf of their clients and customers against unconstitutional acts
that interfere with that business relationship.  *Id.* at 1041.  Falling under this same exception,
Plaintiffs here assert that they clearly meet all three requirements to assert claims on behalf of
FDOC inmates who desire to receive their communications.[7]

As noted above, a close relationship between the litigant and third-party is needed to sa-
tisfy the second prong of third-party standing.  *Id.* at 1043.  Such a sufficiently close relationship
has been found in permitting booksellers to assert the First Amendment rights of book buyers[8]
and sellers of contraceptives to assert the privacy rights of customers.[9]  In *Young Apts.*, the Ele-
venth Circuit similarly found that a minority landlord had a sufficiently close relationship with
his minority tenants to satisfy this prong.  529 F.3d at 1043-44.  Third-party standing has also
been upheld in cases where enforcement of a restriction against the litigant prevents the third-
party from entering into a relationship with the litigant, to which the third-party has a legal en-
titlement.  *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990).  Similarly, litigants are allowed

---

[7]  Defendants have alleged, without any support or argument, that Plaintiffs have not established the second and
third prongs of the test, but have presented no argument regarding the first prong.  Mot. at 6-7.  Plaintiffs will
therefore assume that Defendants have conceded the first prong, and discuss only the last two prongs herein.
[8] *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392 (1988).
[9] *Carey v. Population Serv. Int'l*, 431 U.S. 678, 682-83 (1977); *Eisenstadt v. Baird*, 405 U.S. 438, 443 (1972).

to assert the rights of third-parties that would be diluted or adversely affected should their constitutional challenge fail and the statute remain in force. *Craig v. Boren*, 429 U.S. 190, 195 (1976).

Here, Plaintiffs enjoy a sufficiently close relationship with third-party inmates by virtue of inmates' participation in Plaintiffs' services. Plaintiffs correspond with inmates and provide them with a service through which they can obtain fellowship through further pen pal correspondence. As a result, Plaintiffs and the inmates' interests are "inextricably bound" because the Rule injures Plaintiffs' ability to provide their services to Florida inmates, and at the same time it denies inmates access to seek out Plaintiffs' services. *See Singleton*, 428 U.S. at 114-15.

As to the final prong, the Court has frequently permitted third-party standing when the third-party is hindered in the assertion of his or her own interests. *See Powers*, 499 U.S. at 400. In *Powers*, a criminal defendant appealed his conviction, asserting the rights of third-party jurors who had been discriminatorily excluded during jury selection. *Id.* In upholding the criminal defendant's third-party standing, the Court found that although the jurors had the ability to bring a claim, it was unlikely that they would do so themselves because of the high costs and low benefits of such an action. *Id.* at 411-15; *see also Singleton*, 428 U.S. at 117 (finding that physicians had third-party standing on behalf of women who sought medical abortions and were unlikely to assert their own rights due to their desire to protect their privacy from the publicity of a lawsuit).

Like the indirect litigants in *Powers* and *Singleton*, Plaintiffs are likely to advocate vigorously on behalf of inmates who desire to receive their communications but may be hesitant to challenge the Rule due to fear of retaliation or disciplinary action. *See Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-57 (1984)(holding that a fundraising organization had third-party standing to challenge a statute when the statute's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression"); *Massey v. Wheeler*,

- 10 -

221 F.3d 1030, 1035 (7th Cir. 2000)("When the third-party plaintiff seeks to vindicate First Amendment rights, the Supreme Court has further relaxed the requirement that the plaintiff show some obstacle to the first party's ability to bring his own claim.").

III.    **Plaintiffs Have Valid Claims Under the First Amendment** [10]

A.    **The Rule is properly assessed under *Procunier*'s heightened standard**

As more fully discussed above, Plaintiffs clearly enjoy a First Amendment interest in communicating with prisoners through the mail.  *See Thornburgh,* 490 U.S. at 408.  While Defendants state that the four factor test set out in *Turner* should be used to analyze their Rule, a closer review of the cases cited by Defendants instead suggest that this Court should utilize the *Procunier* standard –not *Turner*'s reasonableness inquiry.

In arguing that this Court should utilize *Turner*, Defendants cite *Thornburgh* for the proposition that "regardless of whether the person challenging a prison regulation is an inmate or non-inmate, the [*Turner*] test is applicable."  Mot. at 19.  This reading of *Thornburgh* is patently incorrect.  In *Thornburgh*, the Court went to great lengths to explain its rationale behind *Turner*'s deferential approach to prison regulations implicating First Amendment freedoms, and further delineated the types of regulations – such as the one at issue – that would still be subject to *Procunier*'s heightened scrutiny.  *Thornburgh*, 490 U.S. at 409-411.

Defendants are correct that *Thornburgh* rejected arguments that the proper test to be applied depended on the identity of the individual whose rights had allegedly been infringed.  Mot. at 19-21.  While Defendants' analysis may stop there, however, *Thornburgh*'s analysis did not.  Focusing not on the identity of the parties involved, but instead on the prison's justification for

---

[10] In addition to the arguments contained herein, Plaintiffs incorporate by reference their Motion for Summary Judgment (D.E. 80), regarding Plaintiffs' First Amendment claims.

the challenged rule, *Thornburgh* felt that *Procunier*'s heightened standard did not give enough defe-rence to the determinations of prison administrators and was not appropriate "for the consideration of regulations that are <u>centrally concerned with the maintenance of order and security with-in prisons</u>." *Thornburgh*, 490 U.S. at 409-410.

     *Thornburgh* continued to explain that when analyzing prison regulations which do not pose any serious threat to order and security <u>inside</u> the prison – such as *Procunier*'s outgoing cor-respondence rule – prison administrators are not entitled to the same level of deference as in *Turner*, and courts should instead continue to apply *Procunier*'s standard of heightened scrutiny. *Id.* at 411-412.  Similar to the outgoing mail correspondence rule in *Procunier*, the pen pal corres-pondence regulated by the Rule poses no threat to security <u>within</u> the prison.  *See id.* at 411-412; Bair Decl. ¶ 26.  According to Defendants' own admissions, the <u>only</u> justification for the chal-lenged Rule is protection of the public from fraud – <u>not</u> internal security.  *See* Upchurch Dep. at 120:25-121:20, D.E. 80-3; Overstreet Dep. at 56:25-57:21, D.E. 80-6.

     As Defendants have failed to establish that the Rule poses <u>any</u> serious threat to order and security inside prisons, Defendants are not entitled to *Turner*'s deferential analysis and the Rule must instead be analyzed under *Procunier*'s heightened scrutiny.  In line with *Procunier*'s anal-ysis, and as discussed more fully in Plaintiffs' Motion for Summary Judgment, it is clear that the Rule (1) does not further an important or substantial governmental interest unrelated to the sup-pression of expression, and (2) does not involve a limitation of First Amendment freedoms no greater than necessary or essential to the protection of the particular governmental interest in-volved, and therefore Defendants' Motion must be denied.[11]

---

[11] Defendants further argue that *Turner* should apply because Plaintiffs have challenged the Rule only in relation to "the rejection of their incoming mail."  Mot. at 19 n. 9.  Contrary to Defendants' assertion, however, Plaintiffs have

**B.**      **Defendants' Rule similarly fails under *Turner***

Even if this Court determines that Defendants' Rule is properly analyzed under the more deferential *Turner* standard, Defendants have still failed to put forward sufficient material, undisputed facts to support the Rule's constitutionality.

While Defendants are correct that a certain level of deference should be given to prison administrators, the Court has made it abundantly clear that *Turner*'s "reasonableness standard is not [a] toothless [one]," and that courts must not blindly defer to the judgment of prison administrators simply because institutional concerns are at issue.  *Thornburgh*, 490 U.S. at 414; *see also Bradbury v. Wainwright*, 718 F.2d 1538, 1543 (11th Cir. 1983) ("Although deference to prison administrators is 'wide-ranging,' courts are not required to abdicate their responsibility to redress constitutional violations.").  Thus, despite the "difficult tasks" faced by prison administrators, if "a prison regulation or practice offends a fundamental constitutional guarantee, federal courts [must] discharge their duty to protect … constitutional rights."  *Procunier*, 416 U.S. at 405-6.

Here, Defendants have argued that the Rule does not offend a fundamental constitutional guarantee because "the record is replete with evidence of a valid rational connection between the challenged rule and Defendants' legitimate penological interests."  Mot. at 25.  Curiously, however, Defendants fail to offer a single piece of actual evidence to demonstrate such a rational connection, and instead ask this Court to blindly defer to the judgment and opinions of Defendants' hired expert and security witness.  Such unsupported allegations cannot serve as the basis for a finding of constitutionality, even under *Turner*'s deferential standard.  *See Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990).

---

clearly challenged the Rule as it has been applied to ban both their correspondence to inmates as well as inmates' correspondence to Plaintiffs (i.e., outgoing mail).  *See* Lovell Decl. ¶ 14; Perry Decl. ¶ 16.

In stating a legitimate penological objective for *Turner*'s purposes, prison authorities "cannot rely on general or conclusory allegations to support their policies." *Id.* at 386.  For a challenged prison regulation to be upheld under *Turner*, prison authorities must not only identify the specific penological interests involved, but are also <u>required</u> to make an evidentiary showing that the specific interests involved were the actual impetus for the regulation in question and that the regulation is reasonably related to those interests.  *See id.*  It is only after prison authorities have put forth such evidence that courts should defer to their judgment.  *See id.*; *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002)(striking down a prison regulation barring public viewing of executions as unconstitutional, finding that while ensuring staff safety was a legitimate penological goal, "defendants had presented no evidence that execution staff had ever been, or were ever likely to be, publicly identified or attacked.").

While Defendants and their primary witness on this issue – Steve Arnold – have shared plenty of anecdotal references to inmates who have supposedly "scammed" gullible members of the public, they have provided no actual evidence that pen pal correspondence presents any sort of threat to the general public or that <u>any</u> identifiable member of the general public has ever been harmed by a FDOC inmate through the use of pen pal solicitation.  Upchurch Dep. at 122:10-25; 123:16-25; 126:1-5; Arnold Dep. at 29:15-19; 35:9-11; 62:2-4, D.E. 80-10.

In short, while Defendants repeatedly quote the self-serving opinions of its expert and witness that the public <u>could</u> be harmed by allowing Plaintiffs to operate within FDOC facilities, such allegations lack evidentiary support, and where fundamental constitutional guarantees are at issue, courts require a greater evidentiary showing than the <u>purely hypothetical</u> potential for abuse put forth by Defendants.  "Although prison officials may pass regulations in anticipation

- 14 -

of security problems, they must at a minimum supply some evidence that such potential problems are real, not imagined." *Woodford*, 299 F.3d at 882.

Defendants' post hoc internal security and mail volume justifications suffer from an identical lack of evidentiary support. While Defendants state in a wholly conclusory manner that allowing inmates to solicit for pen pals would have a "deleterious effect" on FDOC resources and internal security, they have provided no actual evidence to suggest that such an increase in mail volume would actually occur, or that internal security would be affected in any way, and Plaintiffs certainly dispute those material factual assertions.[12]  Moreover, while Defendants' novel internal security justification – identified for the first time at this second round of summary judgment motions – has been recognized in other contexts as a legitimate penological objective, it can only be used to justify this policy when there is evidence that it was here the <u>actual basis</u> for the Rule itself.  *See Walker*, 917 F.2d at 386 (while prison had asserted internal security justifications for their hair grooming policy, court denied summary judgment where officials had failed to produce any evidence that internal security concerns were the actual bases for the policy in question).  Here, the record is clear that the only actual justification for the adoption of the Rule was protection of the public from fraud – not internal security.[13]  *See* Upchurch Dep. at 120:25-121:20; Overstreet Dep. at 56:25-57:21.

Defendants conclude their analysis by asserting that Plaintiffs pose a security concern because neither Plaintiff conducts any "monitoring of the pen pal relationships and act only as a

---

[12]  Unlike *Rodriguez v. Ames*, 224 F.Supp.2d 555 (W.D.N.Y.), cited by Defendants, the FDOC already monitors all outgoing routine mail correspondence to determine if such correspondence poses a threat to institutional security. *See* Rule 33-210.101(5), F.A.C.

[13] As more fully argued in Plaintiffs' Motion to Strike (D.E. 85), incorporated here by reference, Defendants' allegation that the Rule implicates internal security – asserted for the first time in the Second Affidavit of James Upchurch in support of Defendants' Motion (D.E. 79-5, Ex. I) – is unequivocally contradicted by Defendants' deposition testimony.  *See* Upchurch Dep. at 120:25-121:20.

conduit … by which contacts are facilitated with no actual follow-up to discover the potential abuses giving rise to the public safety concerns by the Department." Mot. at 3-4, 31-32.

Defendants' "monitoring" concerns, however, are entirely belied by the fact that Defendants continue to allow a pen pal service that is nearly identical to Perry's service – "Christian Pen Pals" – to freely market its services to, and correspond with, FDOC inmates. *See Woodford*, 299 F.3d at 881 (if a prison regulation contains "loopholes that undermine its rationality and the credibility of defendants' concerns," such regulation may be found to fail *Turner*'s analysis).

Here, the credibility of Defendants' concerns regarding the safety risk posed by Plaintiffs are completely undermined by the fact that Defendants continue to allow Christian Pen Pals to freely correspond and market its services to inmates. While Defendants repeatedly harp on Plaintiffs' alleged lack of accountability, Christian Pen Pals also does not monitor any of the correspondence between inmates and their pen pal correspondents, and, unlike WAP, has no ability to verify any of the information which the inmate might provide to the non-prisoner correspondent. Michaels Dep. at 56:18-24, D.E. 80-4. Christian Pen Pals does not perform any background checks on the free world persons who write seeking to correspond with an inmate, nor did Defendants perform any sort of background check or investigation into Christian Pen Pals before granting it exclusive and unfettered access to its inmates. *Id.* at 56:1-2; Upchurch Dep. at 119:20-24. Defendants have put forth <u>no</u> justification for this selective enforcement of the Rule.

## IV.   <u>Plaintiffs Have Valid Procedural Due Process Claims</u>[14]

Defendants correctly cite the three <u>minimum</u> safeguards required whenever prison officials make the decision to withhold delivery of even a single piece of prison mail: (1) notice to

---

[14] In addition to the arguments contained herein, Plaintiffs incorporate by reference their Motion for Summary Judgment (D.E. 80), regarding Plaintiffs' due process claims.

the inmate that the correspondence has been rejected; (2) a reasonable opportunity for the sender of the correspondence to protest that decision; and (3) referral of all complaints to a prison official other than the person who originally disapproved of the correspondence.  Mot. at 32.

Plainly unable to establish that they have provided Plaintiffs with <u>any</u> of these procedural safeguards, Defendants then turn to several barely colorable arguments, none of which address the safeguards they themselves cite, and all of which are contradicted by well established law.

First, Defendants attempt to argue that Plaintiffs' due process claims are without merit because Plaintiffs have no constitutional right to send correspondence "which will <u>undoubtedly</u> cause a safety and security risk to prison facilities," even going so far as to compare Plaintiffs' rehabilitative services with shouting fire in a crowded theater and sending letters containing coded escape plans.  Mot. at 33 (emphasis added).  Despite Defendants' laughable attempts to confuse Plaintiffs' constitutionally protected expression with recognized criminal activity, the law is clear that Plaintiffs enjoy a constitutional right to send inmates correspondence regarding their services unless such correspondence directly suggests criminal activity.  *Procunier*, 416 U.S. at 412; *Id.* at 417 ("[t]he interest of prisoners and their correspondents in uncensored communication by letter … is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment.").

Next, Defendants argue that Plaintiffs' communications are not entitled to *Procunier*'s due process protections because "Plaintiffs' letters are more akin to mass mailings than personalized correspondence."  Mot. at 34.  Directly contrary to Defendants' assertion, however, courts have widely held that *Procunier*'s due process requirements apply to <u>all</u> forms of correspondence addressed to an inmate, whether that correspondence takes the form of a personalized letter or a "mass mailing."  *See Bonner v. Outlaw*, 552 F.3d 673, 677 (8th Cir. 2009) ("It is the inmate's inter-

est in 'uncensored communication' that is the liberty interest protected by the due process clause, regardless of whether that communication occurs in the form of a letter, package, newspaper, magazine, etc."); *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004)(due process rights apply to rejection of magazines); *Krug v. Lutz*, 329 F.3d 692, 697 (9th Cir. 2003)(due process rights apply to rejection of newspapers).

Lastly, Defendants allege that even if Plaintiffs enjoy a limited due process right, Defendants have provided all the process that is due under *Procunier*. Mot. at 34. Interestingly, this assertion is not followed by an analysis of *Procunier*'s requirements, but a mere assertion that Plaintiffs were provided notice of the rejection of their mail and then were not forbidden from protesting the decision, ignoring *Procunier*'s last two procedural safeguards. Mot. at 34. But, as Defendants are well aware, *Procunier* requires more than mere notice, and indeed requires that any prison regulation restricting prisoner mail provide, within the regulation itself, the three safeguards cited above. *Procunier*, 416 U.S. at 417-419, *approving Martinez v. Procunier*, 354 F.Supp. 1092, 1097 (N.D. Cal. 1973). Thus, Defendants have no valid argument that the Rule does not violate Plaintiffs' procedural due process rights.

## V.     Perry Has Valid Religious Claims Under RLUIPA and FRFRA[15]

Defendants contend that Perry has no valid claim under either RLUIPA or FRFRA because the Rule does not substantially burden her religious exercise, failing to cite a single analogous case in support. Mot. at 14. In fact, other than unsupported assertions from the FDOC chaplain,[16] the only argument that Defendants make is that Perry has not suffered a "substan-

---

[15] In addition to the arguments contained herein, Plaintiffs incorporate by reference their Motion for Summary Judgment (D.E. 80), regarding Plaintiffs' RLUIPA and FRFRA claims.

[16] Defendants quote an affidavit provided by Alex Taylor, Chaplain for the FDOC, which should be struck for the reasons set forth in Plaintiffs' Motion to Strike, and, incredulously, the apparent beliefs of Defendants' counsel regarding the mandates of Christianity. Motion at 15-16. This testimony is not only improper, but irrelevant. *See*

tial" burden of her religious exercise, and that the Rule presents no more than an "inconve-nience" to her religious practice. *See* Mot. at 15-18. However, Plaintiffs have presented ample evidence that Perry has been completely prevented from exercising a vital tenet of her religious practice - ministering to inmates - a much greater burden than the mere "inconvenience" that Defendants claim. *See* Perry Decl. ¶ 6 ("I realized that ministering to inmates through pen pal correspondence was my calling from the Lord, and how I was to demonstrate my personal con-victions to God."); *Id.* at ¶ 16 ("As a result of the Florida Department of Corrections' ban on my correspondence, I have been unable to fulfill my religious calling and prevented from practicing a central tenant of my faith.").

Furthermore, Defendants have incorrectly framed the issue as whether the Rule would place a substantial burden on <u>any</u> adherent to Perry's religion. The correct standard, however, is whether the Rule substantially burdens the specifically held religious beliefs of Perry and the in-mates whom her ministry serves. *See e.g.*, *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1314 (10th Cir. 2010)("Contrary to defendants' arguments, however, the issue is not whether the lack of a halal diet that includes meats substantially burdens the religious exercise of any Muslim practitioner, but whether it substantially burdens Mr. Abdulhaseeb's own exercise of his sincerely held reli-gious beliefs."); *Brown v. Ray*, 2010 WL 723691, 7-8 (W.D. Va. 2010). Accordingly, Defendants' Motion for Summary Judgment on Perry's RLUIPA and FRFRA claims should be denied.

**VI.    Defendants Have Waived Eleventh Amendment Immunity**

Contrary to Defendants' strident assertion that "decades old Supreme Court precedent" preclude this Court from considering Plaintiffs' FRFRA claim, Eleventh Amendment immunity

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 333 (5th Cir. 2009) ("Prison chaplains are not arbiters of the meas-ure of religious devotion that prisoners may enjoy or the discrete way that they may practice their religion.").

can be waived by a state through affirmative conduct.  *See Ku v. State of Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003)(quoting *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613 (2002)); *Stevens v. Gay*, 864 F.2d 113, 115 n. 5 (11th Cir. 1989).

Here, Defendants have waived their right to assert an Eleventh Amendment immunity defense by aggressively litigating this case in federal court, failing to raise the defense in their answer to Plaintiffs' twice amended complaint or in any motion to dismiss, and conducting extensive discovery as to this count.  *See Reynolds v. Alabama Dept. of Transp.*, 976 F.Supp.1431 (M.D. Ala. 1997)(state can waive Eleventh Amendment immunity by aggressively litigating a cause and failing to timely raise the defense); *Christy v. Pennsylvania Turnpike Commission*, 54 F.3d 1140, 1144 (3d Cir. 1995)(Eleventh Amendment immunity should be treated as any other affirmative defense); *Ku*, 322 F.3d at 434 (noting that the Supreme Court has established a clear rule of waiver by affirmative conduct).  Raising the issue for the first time at summary judgment creates "inconsistency and unfairness," and accordingly waives immunity.  *Id.* at 435.

## CONCLUSION

Because Defendants have failed to meet their burden of submitting evidence establishing that no genuine issue as to any material fact exists in this case, and have further failed to establish that they are entitled to judgment as a matter of law, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.

Respectfully submitted,

Randall C. Berg, Jr., Esq.
Florida Bar No. 318371
Joshua A. Glickman, Esq.
Florida Bar No. 43994
Shawn A. Heller, Esq.
Florida Bar No. 46346

Florida Justice Institute, Inc.
3750 Miami Tower
100 S.E. Second Street
Miami, Florida 33131-2309
305-358-2081
305-358-0910 (FAX)
E-mail: *RBerg@FloridaJusticeInstitute.org*
E-mail: *JGlickman@FloridaJusticeInstitute.org*
E-mail: *SHeller@FloridaJusticeInstitute.org*

Attorneys for the Plaintiffs

By:   *s/Joshua A. Glickman*
Joshua A. Glickman, Esq.
Florida Bar No. 43994

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 12, 2010, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing docu-

ment is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission of Notices of Electronic Filing gen-

erated by CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive electronically Notices of Electronic Filing.

*s/ Joshua A. Glickman*
Joshua A. Glickman, Esq

<u>**SERVICE LIST**</u>
**Case No. 3:09-cv-403-J-34 JRK**
**Middle District of Florida, Jacksonville Division**

by CM/ECF:

<u>**Counsel for the Defendants**</u>

Joe Belitzky, Esq.
Office of the Attorney General
PL-01 - The Capitol
400 S Monroe St
Tallahassee, FL 32399
850/414-3669
Fax: 856/488-4872
Email: joe_belitzky@oag.state.fl.us

Shelly L. Marks
Assistant Attorney General
Corrections Litigation Bureau
Office of the Attorney General
State of Florida
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3647
Email:  Shelly.Marks@myfloridalegal.com

Lance Neff
Assistant Attorney General
Corrections Litigation Bureau
Office of the Attorney General
State of Florida
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3647
Email:  Lance.Neff@myfloridalegal.com