UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Joy Perry, d/b/a Freedom Through
Christ Prison Ministry, d/b/a Prison
Pen Pals, and WriteAPrisoner.com, Inc.,

Case No. 3:09-cv-403

Plaintiffs,

v.

**MEMORANDUM AND ORDER**

Barry Reddish, Steven Singer, Kim
Southerland, and Walter A. McNeil,

Defendants.

---

This matter is before the Court on parties' respective Motions for Summary Judgment and Plaintiffs' Motion to Strike. For the reasons that follow, Defendants' Motion for Summary Judgment is granted, and Plaintiffs' Motion for Summary Judgment is denied. As the Court stated at oral argument, Plaintiffs' Motion to Strike is also denied.

**BACKGROUND**

Plaintiff Joy Perry operates two non-profit pen pal services, one religious (Freedom Through Christ Prison Ministry), and one secular (Prison Pen Pals). Plaintiff WriteAPrisoner.com, Inc. ("WAP"), is a for-profit organization that serves inmates and non-inmates desiring to solicit pen pals. Defendants are employees of the Florida Department of Corrections ("FDOC").

Perry serves as a conduit of sorts; she compiles lists of inmates who have written her

seeking a pen pal and then sends those lists to individuals or groups in the free world who are seeking an inmate pen pal. She does not solicit inmates herself. Additionally, although one of Perry's organizations promotes a religious agenda, she does not provide religious materials to inmates herself. Perry does not charge a fee for her services.

WAP is a national organization that allows prisoners, for $40 a year, to place a pen pal advertisement on its website. With the exception of this for-profit status, WAP operates in a similar fashion as Prison Pen Pals in all other respects. WAP also supplies educational materials to prisons, provides a complimentary online resume-posting service to inmates who are transitioning to the free world, and oversees a scholarship program that doles out money to children of inmates or victims of crimes.

In 2004, FDOC adopted a rule that prohibits inmates from soliciting pen pals. The rule's specific language is as follows:

> Inmates shall not use correspondence privileges to solicit or otherwise commercially advertise for money, goods, or services. For the purposes of this rule this includes advertising for pen-pals; inmates are not prohibited from corresponding with pen pals, but shall not place ads soliciting pen pals. Inmates who post ads or have ads posted with the assistance of another person shall be subject to disciplinary action.

Fla. Admin. Code Ann. r. 33-210.101(9). Since this rule's adoption, Plaintiffs have been unable to market services to, or receive requests from, inmates. In the case of WAP, this includes mail sent to inmates as part of its complimentary resume-collection program.

The main rationale proffered by FDOC for this rule is that, prior to the rule's enactment, inmates were using the pen pal solicitation service to defraud unsuspecting

2

individuals in the outside world. FDOC notes that such instances of fraud are more apt to occur where, as in this case, the soliciting companies do not monitor the inmates' correspondence. Although no such incidents are officially cited in the record, FDOC points to one of its witness's testimony—Mr. Steven Arnold, a former FDOC employee—for evidence that such scams have actually occurred. There is also strong anecdotal evidence from newspaper reports throughout the country that such scams occur. Finally, FDOC also offers the maintenance of internal prison security as a rationale for the subject rule.

Plaintiffs complain that not only are their solicitation mailings rebuffed by the FDOC, but that the FDOC has allowed a pen pal service named "Christian Pen Pals" to continue to contact inmates. Defendant notes that unlike Plaintiffs' organizations, Christian Pen Pals provides an exclusive, one-to-one matching service that connects one person from the free world to one inmate. This drastically decreases inmates' ability to run scams on a large-scale basis, if at all.

Plaintiffs filed suit on five Counts. Counts I and II allege violations of free speech as protected by the First and Fourteenth Amendments and 42 U.S.C. § 1983; Count III alleges violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1 et seq. ("RLUIPA"), as to Freedom Through Christ Prison Ministry only; Count IV alleges violation of the Florida Religious Freedom Restoration Act of 1998, Fla. Stat. § 761.01 et seq. ("FRFRA"), as to Freedom Through Christ Prison Ministry only; and Count V alleges a violation of due process pursuant to the First and Fourteenth Amendments.

**DISCUSSION**

Before delving into the substantive each of Plaintiffs' claims, the Court must first address the threshold issue of standing. Thus, as each Count is addressed in turn, the Court will begin with a discussion on standing before proceeding to the merits of the claim.

**A.     Summary Judgment Standard**

Summary judgment is proper only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). When opposing a motion for summary judgment, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**B.     Free Speech Claim, 42 U.S.C. § 1983 (Counts I & II)**

Defendant first argues that Plaintiffs' free speech claims are nothing more than

cleverly disguised attempts to assert a third party's (namely, the prisoners') rights. "Absent exceptional circumstances, a third party does not have standing to challenge injury to another party." Miccosukee Tribe of Indians v. Fla. State Athletic Comm'n, 226 F.3d 1226, 1230 (11th Cir. 2000) (citing Warth v. Seldin, 422 U.S. 490, 499 (1975)). To successfully assert third party standing, one must show that "(1) the [plaintiff] suffered an injury in fact; (2) [the plaintiff] had a close relationship to the [third party]; and (3) there was some hindrance to the [third party] asserting [its] own rights." Campbell v. Louisiana, 523 U.S. 392, 397 (1998) (internal quotation marks omitted).

The last two elements of the standing test are dispositive here. As regards the second element, the Third Circuit has held that a "close relationship . . . must allow the third-party plaintiff to operate 'fully, or very nearly, as effective a proponent,' of the potential plaintiff's rights as would the plaintiff himself." Nasir v. Morgan, 350 F.3d 366, 376 (3d Cir. 2003) (quoting Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 290 (3d Cir. 2002)). The court listed several examples of relationships that are sufficiently "close" to confer third party standing, including doctor/patient, lawyer/client, and vendor/customer. Id. It stated explicitly, however, that mere "correspondence" is not sufficient enough to "rise to third-party standing." Id. In this case, Plaintiffs maintained a relationship with the inmates closely resembling the "correspondence" relationship that was specifically rejected in Nasir. In any event, it is evident that Plaintiffs do not maintain with inmates any of the requisite relationships listed above, and therefore fail to satisfy the second element.

The third element, a third party's hindrance in asserting its own rights, is also lacking

in this case. As Defendant points out, Plaintiffs have made no effort to explain why a third party—either an inmate or a free world individual/group—cannot assert its own rights in this case. Therefore, to the extent that Plaintiffs attempt to assert third parties' rights in this case, this Court holds that they lack standing to do so.

Yet Defendant goes a step further, arguing that Plaintiffs are not seeking to advance even their own First Amendment rights. Indeed, to have standing to assert an alleged harm sustained to oneself, a plaintiff must have suffered injury-in-fact, there must be a causal connection between the injury and the allegedly harmful conduct, and a favorable decision must give the plaintiff redress for his harm. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). With regard to Perry's two organizations, Freedom Through Christ and Prison Pen Pals, Defendant argues that Perry serves only as a conduit for correspondence between inmates and free world individuals. With regard to WAP, Defendant states that the only harm inflicted is economic, which insufficient to confer standing. Thus, Defendant essentially claims that none of the Plaintiffs have suffered an injury-in-fact.

An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. at 560 (citations omitted). Defendant does admit that all of Plaintiff organizations have, in some capacity, attempted to write to inmates (if only to advertise their services), and, since the subject rule has been adopted, Plaintiffs have been rebuffed. It should also be noted that the Supreme Court has recognized that publishers "have a legitimate First Amendment interest in access to prisoners." Thornburgh v. Abbott, 490 U.S. 401, 408 (1989). Finally, both

inmates and non-inmates have a First Amendment interest in correspondence sent to one another.  Procunier v. Martinez, 416 U.S. 396, 408-09 (1974).

Unfortunately, the Eleventh Circuit has not reached the issue of whether a FDOC rule that allowed for impounding publications based on their advertising content was constitutional.  Prison Legal News v. McDonough, 200 Fed. App'x 873 (11th Cir. 2006).  Indeed, while this case was pending, the rule was amended and thus that issue was dismissed as moot.  Id. at 878.

The closest analogous case to the instant matter can be found in Prison Legal News v. Lehman, 397 F.3d 692 (9th Cir. 2005), wherein the court held that a prison rule banning non-subscription bulk mail and catalogs was unconstitutional.  Id. at 701.  Despite the wide net cast by the challenged rule for mail being sent to prisoners, the court noted that "[t]his case is not a scenario in which a publisher has attempted to flood a facility with publications sent to all inmates, regardless of whether they requested the publication."  Id.

In the instant case, the majority of Plaintiffs' mailings are unsolicited advertisements for their pen pal services.  Although it may seem inapt to deem such advertisements "publications," the definition of "publication" cited by the Supreme Court in Thornburgh includes the mailings that are the subject of this case: "The term 'publication' is defined as 'a book . . . , or a single issue of a magazine or newspaper, plus such other materials addressed to a specific inmate [such] as advertising brochures, flyers, and catalogues.'" Thornburgh, 490 U.S. at 404 n.4 (quoting 28 C.F.R. § 540.70(a)).  Additionally, as noted above, the Supreme Court has held that both inmates and non-inmates have a First

7

Amendment interest in correspondence sent to one another. Procunier, 416 U.S. at 408-09. Thus, Plaintiffs have established that a concrete, legally protected interest that they enjoy has been harmed.

Simply because Plaintiffs have incurred some damage to a legally protected interest does not mean that their argument must carry the day, however. The Court must now address the question of which substantive test it must apply to determine whether Plaintiffs may recover on the harm suffered. There are two such tests proffered by the Supreme Court. The first test, articulated in the Procunier case referenced above, applies a form of heightened scrutiny to prison regulations: "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. . . . Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." Procunier, 416 U.S. at 413. Not surprisingly, Plaintiffs argue that this is the test that should be applied to the instant case.

Procunier, however, was later partially overruled by the Court in Thornburgh. Indeed, to the extent that the Procunier standard survives, it applies only to outgoing correspondence. See Thornburgh, 490 U.S. at 413-14. Outgoing correspondence is simply not at issue in this case; to the extent that Plaintiffs would like to make it so, they are barred from doing so because, as discussed above, they lack standing to sue on behalf of any allegedly aggrieved third party. Thus, the second test, first adopted by the Supreme Court in Turner v. Safley, 482 U.S. 78 (1978), is applicable here.

Turner stated that a "regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. In analyzing this standard, courts employ a four-factor test:

> (1) whether there is a 'valid, rational connection' between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an 'exaggerated response' to prison concerns.

Pope v. Hightower, 101 F.3d 1382, 1384 (11th Cir. 1996) (quoting Turner, 482 U.S. at 89-91).

Under the first factor, FDOC asserts that its rule is necessary to prevent inmates from scamming the general public.[1] Indeed, it has proffered an abundance of evidence demonstrating that inmates' use of pen pal services such as those run by Plaintiffs have led to widespread fraud schemes throughout the country. (See Defs.' Mot. Summ. J. at 32 n.16, Exs. F-G.) Further, a former FDOC employee, Mr. Steven Arnold, testified that, before the rule was enacted and based on his several years as a FDOC employee, such scams were common in the FDOC system. Despite Mr. Arnold's inability to point to a specific instance

---

[1] Plaintiffs' complaint that they are treated differently than another pen pal organization, Christian Pen Pals, is irrelevant to this analysis. Indeed, Plaintiffs have asserted no Equal Protection claim. Furthermore, Christian Pen Pals is readily distinguishable from Plaintiffs' organizations in that the former provides a one-to-one matching service; no advertisements that solicit pen pals on a mass scale are involved. In other words, Christian Pen Pals's procedure does not violate the challenged rule; Plaintiffs' procedures do.

9

of scam, his testimony is based on a significant timeframe of personal observation and is highly probative of the effect such scams have on the prison system.

Additionally, the large amounts of money that are collected by inmates through these scams threatens internal prison security.[2]  Indeed, it is not farfetched to envision a prison climate, wherein large amounts of money was present, that was rife with extortion, bribery, and the purchasing of various "services." (Upchurch Aff. at 2.)

Internal prison security is a quintessentially legitimate penological interest, and the Eleventh Circuit has held that protection of the public is as well. See, e.g., Pope, 101 F.3d 1385. Plaintiffs have not come forward with any evidence to rebut these rationales, and, as noted above, a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Thus, these rationales provide more than a sufficient

---

[2] Plaintiffs argue that, because FDOC relies on contradicting statements made by James Upchurch in asserting the "internal prison security" rationale, the Court should disregard the rationale. Plaintiffs compare James Upchurch's deposition in which he states that protecting the public was the only rationale for the rule at issue, with Upchurch's later affidavit in which he adds internal security as a rationale. Of course, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984). But no true contradiction exists here. Indeed, Upchurch's declaration merely adds a rationale; it does not dispense with the already-given, primary rationale of public protection. Such an addition is not enough to render Upchurch's testimony a "sham," id., and therefore this Court will consider the internal prison security rationale.

"valid, rational connection" required by the first factor, and FDOC must be granted summary judgment thereon.

The second factor, whether there are alternative means of expression available, is also satisfied. As FDOC points out, the challenged rule does not prevent Plaintiffs from corresponding directly to inmates themselves; indeed, Plaintiffs could even visit prisoners if they wished. The only issue that must be addressed further with respect to this factor is the extent to which WAP's resume program, a completely different affair than the pen pal match service, should be accommodated under this rule.

Presently, all mailings from WAP are discarded by FDOC because prison officials cannot discern which mailings pertain to the pen pal service and which pertain to the resume program. FDOC's stated solutions for this include that WAP could mail its resume program documents under a different name, or that WAP could advertise to free world persons who could in turn advise inmates about the resume program. The Court finds these rationales convincing. Indeed, it would place a tremendous burden on FDOC to require it to comb through all of WAP's mailings and separate the pen pal solicitations from the resume program advertisements. A simple modification to WAP's return address (e.g., "WAP—Resume Program") would undoubtedly solve this issue. Thus, an adequate alternative means of expression is available to WAP, and FDOC must be granted summary judgment on the second factor.

The third factor, whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources, is also

11

readily satisfied. As FDOC points out, without the challenged rule prison staff would be required to comb through a significant portion of mail, both incoming and outgoing, in an attempt to sniff out any scams that may be afoot. The burden on inmates is relatively smaller, however, as they are still allowed to carry on pen pal relationships—they simply are not allowed to use solicitation services to cultivate those relationships. As mentioned above, the burden on Plaintiffs is also light in comparison; nothing in the challenged rule prohibits Plaintiffs from contacting inmates directly, and, with respect to WAP's resume program, a simple alteration of its return address would remedy its harm.

Finally, the fourth factor, whether the regulation represents an 'exaggerated response' to prison concerns, is satisfied because of the overwhelming evidence of prison scams throughout the country, as well as scams in Florida that reportedly occurred before the rule's enactment. As mentioned above, Plaintiffs have proffered no evidence to rebut these claims, and therefore summary judgment must be granted as to this factor.

In conclusion, although Plaintiffs have standing to bring Counts I and II, these claims must be dismissed because they fail the four-factor test articulated by the Court in <u>Turner</u>.

**B.     RLUIPA Violation (Count III)**

This count applies only to Plaintiff Perry's religious expression through her organization Freedom Through Christ Ministry. Defendant argues that Perry has no standing to bring this claim because she is not an institutionalized person as defined under the statute. Conversely, Perry argues that RLUIPA's plain language does include her claim, and, furthermore, that she has third party standing to bring suit on behalf of inmates.

Perry argues that RLUIPA's "Cause of Action" clause should be construed broadly to include claims by non-inmates such as herself. The pertinent clause states:

> A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

42 U.S.C. § 2000cc-2(a).

Perry's selective quotation of the statute is unavailing. Indeed, just one section before the above-cited provision lies another clause that states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title . . . ." Id. § 2000cc-1(a). Section 1997 defines "institution" as a facility that is owned or operated by the state, and that houses the ill, disabled, or prisoners. Read together, RLUIPA must be construed to say that, if one is an inmate, then the general rules of standing under Article III apply to that individual's claim. Although scarce, case law is unanimous in supporting the proposition that RLUIPA applies only to inmates. See Olson v. Mukasey, 541 F.3d 827, 831 (8th Cir. 2008) ("RLUIPA applies only to land use regulations and persons in an institution."); McCollum v. State of California, No. C04-03339, 2006 WL 2263912, at *2 (N.D. Cal. Aug. 8, 2006) (dismissing the plaintiff's RLUIPA claim because he was not an institutionalized person, and further noting that "[i]t is unsurprising that [the plaintiff] is unable to identify any court that has allowed a non-institutionalized person to make an RLUIPA claim . . . .").

Perry also argues that she has third-party standing to assert an RLUIPA claim on

behalf of inmates. As noted above, however, Perry has failed to establish a requisite relationship necessary to assert third-party standing, and she has failed to show that there is a hindrance to inmates asserting their own rights. Inmates have adequate resources with which to assert RLUIPA claims; Perry has not asserted any viable reason why inmates in this case could not do so. Therefore, her RLUIPA claim must be dismissed.

### C.     FRFRA Violation (Count IV)

Like Count III, this Count applies only to Plaintiff Perry's religious expression through her organization Freedom Through Christ Ministry. Additionally, like RLUIPA, FRFRA prohibits the government from "substantially burdening" a person's exercise of religion, subject to a strict scrutiny test. See Fla. Stat. § 761.03. The difference between RLUIPA and FRFRA, however, is that FRFRA does not apply only to institutionalized persons; it applies to all persons. See id. Thus, unlike her RLUIPA claim, Perry's FRFRA claim cannot be dismissed for lack of standing.

In response, Defendant asserted an Eleventh Amendment sovereign immunity defense. Plaintiff Perry argues that Defendant has waived such a defense because it did not assert the immunity defense in its responses to Perry's twice-amended complaint, it conducted extensive discovery, and it did not file a Rule 12 motion. The first of these arguments is simply meritless, and the Court will not discuss it further. (See Answer to Second Am. Comp. at 5.)

The Eleventh Amendment protects states from suit in federal court for damages

14

incurred in violation of a state statute. Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985). "[A] state will be deemed to have waived its immunity 'only where stated by the most express language or by such overwhelming implication from the text [of the statute] as will leave no room for any other reasonable construction.'" Id. at 239-40 (quoting Edelman v. Jordan, 415 U.S. 651, 673 (1974)). Yet courts have also recognized that "[sovereign immunity] is an affirmative defense which must be affirmatively pleaded." Kennedy v. Cleveland, 797 F.2d 297, 300 (6th Cir. 1986).

As noted above, FDOC pleaded sovereign immunity as an affirmative defense in its Answer. Its participation in extensive discovery is of no moment; indeed, even if the Court were to entertain such an action as potential waiver, in this case there are four other claims that FDOC needed to address under which no immunity defense was available. Moreover, FDOC's failure to file a Rule 12 motion does not destroy its sovereign immunity defense because such a defense is not deemed waivable under Rule 12. See Fed. R. Civ. Pro. 12(h). Defendant timely raised, and no statute expressly abrogates, the Eleventh Amendment defense; therefore, the Eleventh Amendment sovereign immunity defense bars this claim.

### D.   Due Process Violation (Count V)

Plaintiffs also allege that they have been denied procedural due process. The Court in Procunier held that, because an inmate's First Amendment right to send and receive mail is a protected liberty interest under the Fourteenth Amendment's Due Process Clause, certain procedural protections are required when prison officials withhold inmates' mail. Procunier,

416 U.S. at 418-19. As FDOC points out, however, the Supreme Court has subsequently limited the requirements in Procunier to outgoing mail only. Thornburgh, 490 U.S. at 413. Thus, it is doubtful that Plaintiffs, as outside organizations that submit incoming mail only, maintain the requisite liberty interest required to initiate a due process claim.

Even if such an interest existed, however, Plaintiffs' claim must still fail. A due process analysis

> requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through procedures uses, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976). In light of these requirements, the Court in Procunier stated that when prison officials censor mail, the following procedural requirements must be afforded: 1) notice given to the inmate that the piece of mail was rejected; 2) a reasonable opportunity for the letter's author to protest the decision; and 3) complaints be forwarded to an official other than the individual who disapproved the correspondence. Procunier, 416 U.S. 418-19.

It is undisputed that notice was given to Plaintiffs of the rejection of their mailings. Yet Plaintiff Perry complains that, because no procedural recourse is delineated in the challenged rule, they had no reasonable opportunity to protest FDOC's decision to censor their mailings. But procedural recourse does exist under Florida law; indeed, Plaintiff WAP

availed itself of such recourse. See Fla. Stat. § 120.56. There is no requirement of which this Court is aware that the procedure for protesting censorship must be included in the actual administrative rule itself. Neither Plaintiff complains that the procedures contained in the applicable statute are inadequate; therefore, Plaintiffs' procedural due process claim must be dismissed.

**E.  Plaintiff's Motion to Strike**

As noted above and at oral argument, Plaintiffs' Motion to Strike parts of two depositions on which Defendant relies for its summary judgment motion is denied.

Federal Rule of Civil Procedure 56(c) dictates the evidentiary requirements courts must use in considering summary judgment motions. It states, in part, that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. Pro. 56(c)(4).

Plaintiffs complain that James Upchurch, Chief of Bureau Security Operations for FDOC, and Alex Taylor, Head Chaplain for FDOC, were never disclosed by Defendants in response to expert witness interrogatories, and were never submitted via expert witness report as required by Federal Rule of Civil Procedure 26(a)(2)(B). Further, Plaintiffs argue that Taylor was not even disclosed as a possible witness until May 26, 2010, five months after the discovery deadline.

First, much of what Plaintiffs classify as "expert testimony" is, in fact, permissible lay

witness opinion testimony under Federal Rule of Evidence 701.  Second, Plaintiffs' cry of "surprise" at Taylor's testimony falls flat when it is revealed that they deposed Taylor themselves on December 9, 2009.  Third, Plaintiffs' myriad objections to the depositions in question are either unsupported by argument or simply erroneous; indeed, it appears that the statements to which Plaintiff objects are, in fact, admissible under the Rules of Evidence.  Even if some statements were inadmissible, however, "in a ruling on a motion for summary judgment, the Court is capable of disregarding inadmissible statements and determining whether admissible statements create a material factual issue."  Atl. Marine Fla., LLC v. Evanston Ins. Co., No. 3:08-cv-538, 2010 WL 1930977, at *3 (M.D. Fla. May 13, 2010).

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that**:

1. Defendants' Motion for Summary Judgment (Docket No. 79) is **GRANTED**;

2. Plaintiffs' Motion for Summary Judgment (Docket No. 80) is **DENIED**; and

3. Plaintiffs' Motion to Strike (Docket No. 85) is **DENIED**.

**The Clerk shall enter judgment accordingly, terminate all remaining deadlines as moot, and close the file.**

Dated: Friday, January 14, 2011

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge